The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is Massachusetts Dept. of Communications & Cable v. the Federal Communications Commission et al. Appeal No. 192282, Attorney Kravitz. Good morning. May it please the Court, I'm David Kravitz representing the petitioner in this case, the Massachusetts Dept. of Telecommunications & Cable. Good morning. Good morning. I would like to reserve two minutes of my time for rebuttal if I may. You may. Thank you. So the question in this case, as you know, is whether the Department may continue to regulate the rates for basic cable service that is sold by charter in the 32 Massachusetts communities that are affected here. Basic cable, as you know, is the lowest tier of cable service. It generally encompasses only a small handful of channels and it is quite inexpensive. According to the record, the regulated rate for basic cable in the communities here, most of the communities, runs between $12 and $18 a month. Commissioner Starks, in his concurring statement below, said those consumers relying on basic cable service, while they may be few, are often our most underprivileged consumers and often are on fixed incomes. Similarly, the Worcester Community Cable Access, in their comments in the record, said that it is the poorest among us who subscribe to basic cable. And Senator Markey referred to the vulnerable populations who subscribe to basic cable. And it is undisputed on the record here that if the rates for basic cable are deregulated, they will rise substantially in most of the affected communities and, in some of them, nearly doubling. And finally, I think it's worth noting that we're talking only about the regulation for the rates of basic cable service. Everything else the charter sells, including their broadband internet service, of which they're a major provider in these communities, and their higher tier cable services, where you have dozens of channels and movie channels and sports and so forth, all of that is unregulated and will remain unregulated. We're talking only about basic cable. So the question here turns on whether charter has carried its burden to show that the local exchange carrier test or the LEC test in the Communications Act for effective competition has been met in this case. And it has not, and therefore the FCC's order to the contrary should be vacated. Excuse me, can I just ask you a question? Yes. Does the record show an actual amount that will have to be paid if they become deregulated? It does, Your Honor. This is in the appendix at page 246. There is a letter from charter indicating that if the rates are deregulated, they will go to $23.89 a month. And then on top of that, there's an additional so-called broadcast surcharge or something like that, which will go from the regulated rate of $8 or $9 a month to, I think, about $12 a month. So those are the rates that we're talking about. Thank you. So I think I'd like to begin with what I think is the most straightforward textual reason why the test is not satisfied in this case. And that is that the LEC test requires that the provider must offer video programming services directly to subscribers. Directly to subscribers. And that word directly does not appear in any of the other tests for effective competition. It appears only in the LEC test. And so I think it's a fairly straightforward textual reading that offering it directly to subscribers must exclude indirect means of offering the service to subscribers. And the service at issue here, service that the charter has invoked in order to show that effective competition exists, is an Internet-based service called Direct TV Now, which is offered by a company called Direct TV LLC. That service, a subscriber, in order to receive that service, must not only buy the service itself, but must also buy, separately, a broadband Internet connection, most likely from charter itself, ironically, in order to receive the service. And so because the service is delivered not directly from Direct TV LLC to the subscriber, but indirectly, by way of a third-party Internet provider, it does not satisfy the test. It does not satisfy the directly-to-subscribers test, the language of the LEC test. Can we go back, please? There's nothing in the statute that mandates it be read the way you're reading it. The FCC had issued regulations before this case which offered a, pardon the pun, which defined offer directly in a different way than you are interpreting it. I don't understand whether you are making a textual argument. If so, what is it? I don't understand if you're saying the agency interpretation through its regulations fails to meet any Chevron test or is otherwise somehow arbitrary. Sure. Thank you, Your Honor. So the regulation that we're talking about, I think the regulation you're referring to, is the FCC's definition of the term offers in the LEC test, which is 47 CFR 76.905E, which was a regulation that they put in place in 1993 and has not been changed since then, and has always defined what the word offers means in the context of all of the effective competition tests, including the LEC test. And so if we look at that regulation, and specifically subsection E1 of the regulation, offers in part refers to whether the provider is physically able to deliver service. That is what offers means. So then if you look at the statute, well here they have to not only offer the service, but they have to offer it directly to subscribers. And the FCC said that DirecTV offers service directly to subscribers because DirecTV now has a direct customer relationship with the subscriber in which DirecTV now markets directly to subscribers, directly bills subscribers, and subscribers pay DirecTV now and they don't pay an intermediary. So what is unreasonable about that definition? What is unreasonable about that definition, Your Honor, is that it is completely inconsistent with the FCC's own regulation of what the word offers means. I'm sorry, I don't understand that. So the FCC has told us since 1993 that the word offers means the delivery of video, that's subsection E1, the delivery of video. And then it also means in E2, it refers to impediments, whether impediments exist and whether customers are reasonably aware. But there's nothing in the regulation that talks about forming a contractual relationship or creating a billing relationship. So if the FCC wants to incorporate those concepts into the word offers, they're free to do so, but they have to amend the regulation through notice and comment. They have not done that here. Five minutes remaining. What do you do with the words by any means? So the words… It's part of the same sentence, so you have to read the whole thing in context. Exactly so, Your Honor, and I think that emphasizes why the word offers has to encompass the delivery of video and therefore why directly modifies that word. As you say, you have to read the whole sentence. So the whole sentence here, you have two essentially adverbial phrases that modify the same verb, which is offers. The first adverbial phrase is directly to subscribers, and the second is by any means other than direct-to-home satellite. So the by any means phrase, by any means other than direct-to-home satellite, I think everybody agrees unquestionably relates to the delivery of video. How is the video delivered by any means? So I'd make two points about that. First of all, that tells us that the word offers has to encompass delivery of video. Otherwise, by any means doesn't make any sense as a modifier of the word offers. But the second point I would make is that the by any means phrase cannot possibly mean by any means directly or indirectly, or by any direct or indirect means. Because if it does that, then it has written directly to subscribers out of the statute. I'll finish your answer and then I have another question. Sure. So just to finish the thought, you can't use the by any means phrase to overwrite the words directly to subscribers. We have to give meaning to every word in the statute, basic statutory construction. But again, the problem with doing it the way charter and the FCC want to do, the directly to subscribers having to do with billing, is that that is not in the definition of offers that the FCC has used for 27 years. So thank you, Judge Lynch. It's a basic element of contract law that you form a contract by making an offer. The FCC looked at the marketing materials of DirecTV now, and they concluded that they were making an offer directly to consumers. When the offer is accepted, they have a contract. I do not understand why you say that there was no fair notice to anyone of what the term offer meant that would have required the FCC to go through notice and comment rulemaking to say, oh, we mean it in the normal contractual sense of the word. So the reason, again, is simply that the FCC has had this exact definition, the one in the regulations, for what offers means. And the FCC says that this qualifies under their definition. But it's inconsistent with the regulation, Your Honor. That is the point. There's nothing in the regulation that has anything to do with creating a billing relationship. That is not what the FCC said. They used that as evidence that they put out marketing materials making an offer. When the consumer accepts that offer, they do it directly with DirecTV now. I'm sorry, I'm probably just missing your point, but do you have anything further to add on this? Are they physically able to deliver service? Are there any regulatory, technical, or other impediments? And are customers reasonably aware that the service exists? So they have applied that consistently. If you look at all of the FCC decisions over all of these years, that is what they have asked. They have asked those questions when they're determining whether a service has offered. They have never asked until this case, they have never asked whether there was a billing. I'm sorry, they didn't. They asked, was there an offer? And then they gave three or four reasons for thinking there was an offer. They never said, we've set up a billing test. I simply don't read the decision the way you do. Well, Your Honor, I think there's no escaping the fact that the decision below, the FCC's order in this case, a new definition of offer that has not previously been employed and does not appear in the regulations. So it goes beyond that. Okay, I got it. Can I ask one question just on the impediment issue? I do understand the Attorney General's argument that cost should be considered an impediment. How do you gauge how much cost is enough to be an impediment? It can't be for every last person. I understand it's going to double the cost, essentially, for the poorest elements of our society. But I'm just trying to understand, what's the limiting principle there? So I think in this case, the record is sufficient on this point to say that when it appears undisputed, that there are thousands of households in the affected areas that find cost to be a barrier or an impediment to their ability to purchase broadband service. That is enough. I agree with you, it wouldn't be just like if there's one family that can't buy it. That probably doesn't qualify. But here, the record is fairly clear. All of the numbers, the parties generally agree that we're talking about something like 20% of households that don't have broadband internet. That is thousands of households in the affected areas. That, I think, that suffices under any reasonable definition to qualify as an impediment. Thank you. Thank you. We'll hear from Mr. Carr now. Good morning, Your Honors. May it please the Court, my name is James Carr, and I represent the Federal Communications Commission in the United States. Mr. Carr, excuse me, I'm sorry to interrupt your train of thought, but I would like to continue something that was discussed now, which is this regulation 76.905, which reads something like, offered when it is physically able to deliver the service. My question has to do with this last part, deliver the service. To me, that means the electronic delivery of what the program is, okay? Not whether you're asking them, the billing, and all these other administrative things that come after you contract. So, to me, deliver the service is not direct, because it goes through an intermediary, doesn't it? Your Honor, the rule you're talking about says that service will be deemed offered, and what the commission was attempting to do there was to give context to the term offer and make sure that the offer that was being made was bona fide. And it includes a couple of different elements. Physically able to deliver service, although it does not say deliver service over one's own facilities. It says deliver service to the potential subscriber. At that point, potential to me also means we don't have any billing issues or anything like that, because they're not even clients yet. I think, Your Honor, if we want to go back to the, I think it's most helpful to go back to the plain text of the statute itself. Because in the statute, and petitioner is arguing, basically, that the phrase directly to subscribers must be read in a certain way. And the petitioner reads that phrase to mean that to qualify for competing service, a provider of competing service may not use third-party facilities in order to deliver that service. It must use its own facilities. Otherwise, if it uses third-party facilities, it's making an indirect offering. So let's go to the text of the statute, which you can find at page 11 of the FCC's brief statutory addendum. And the statute begins, a local exchange carrier or its affiliate, or any multi-channel video programming distributor using the facilities of such carrier or its affiliate, offers video programming services directly to subscribers by any means other than direct-to-home satellite services. I'd like for the court to focus on the first parenthetical in that particular clause. Any multi-channel video programming distributor using the facilities of a local exchange carrier or its affiliate. There is a whole class of providers that is using third-party facilities to deliver service to subscribers. And yet, the statute specifically provides that that group of unaffiliated MVPDs can offer service directly to subscribers. And I think that's why the commission's reading of this statute makes more sense. The idea is the commission looked at the term offer and said it basically means a business relationship, a customer relationship. DirecTV is marketing the service directly to subscribers. When subscribers accept the service, DirecTV is sending it to those subscribers. The subscribers are receiving it from DirecTV, and the subscribers are paying DirecTV. There is no intermediary in that sense. Thank you. Thank you, Your Honor. I'd like also to discuss the impediment question, and Judge Saras had mentioned this earlier. The question of impediment here, the argument that has been raised, is whether the cost of broadband is an impediment to households taking DirecTV now. The record shows that 80% or more of households in the franchise areas are already subscribing to broadband, and the commission reasonably found that when so many households are already subscribing to the service and could immediately start receiving DirecTV now, that the cost of broadband was not an impediment to the offering. Now, the petitioner is pointing to the 20% that don't receive broadband, that don't currently have broadband, but it's certainly reasonable for the commission to look at the large number that do and say that the cost simply has not been an impediment. Would any cost be too high? It may not be when you're dealing with the poorest segment of society. Suppose it's clearly outside the reach of this 20%. Well, again, Your Honor, the test here does not require an offering to everybody in the entire market. In fact, if you look at the other effective competition tests, a couple of them, the competing provider test and the municipal provider test, specify that an offering must be made to at least 50% of households in the franchise area. But there is no statutory test here for effective competition that requires that the offer be made effectively to every household within the community. So even if the 20% are not able to afford broadband, I think under the terms of the statute and the commission's understanding of it, that's not an impediment to an offering that satisfies the statute. So you would consider cost never to fall within the meaning of impediment? I wouldn't go that far, Your Honor. Your Honor, there could be a situation. I'll backfire. May I ask a question? I take it that you think there may be a situation, not this, in which cost could be an impediment. And, indeed, I read the FCC order as leaving that issue open. It is also your position that at 80% already paying for broadband, that that makes the decision rational that the broadband cost cannot be an impediment, especially when you look at the 50% mark in other areas. But as to that 20%, is there anything in the record as to whether they actually have broadband available or whether they have made a choice not to sign up for broadband because of cost reasons? Your Honor, the record indicates that broadband is now available to close to 100% of the subscribers in these franchise areas. In terms of why the 20% is not subscribing to broadband, we don't have specific information in the record. The petitioner cites some generalized observations that the commission itself has made in the past that the cost of broadband is discouraging some people from subscribing to broadband. So while we don't have specific numbers in this case, presumably there are some people in Massachusetts who are not subscribing to broadband because they find it too expensive. But we don't know how much of the 20% that is. We just don't know. There's not enough in the record. I think from the commission's perspective, it was enough to have found that the vast majority of households in the franchise areas already subscribe to broadband and could start receiving programming from DirecTV now immediately. And therefore, the cost was not an impediment. I'm sorry, Your Honor. Go ahead. Did I interrupt your thought? No, I'm done. Go ahead, Your Honor. Okay. Has the present system worked adequately? I'm sorry, by the present system, Your Honor, what do you mean? The regulation by Massachusetts of the system. Cable rate regulation? If you mean cable rate regulation? I don't know that the commission has any particular position on that. But I think it's clear that Congress made a policy judgment many years ago that once effective competition took hold in particular markets, that rates at that point should be set by the competitive market rather than by regulation. And that's all the commission is doing here. It's implementing the policy judgment that was made by Congress many years ago. At the time Congress made it, it was clear that cable had a dominant position in the marketplace and was facing virtually no competition. It's now more than 25 years later, and the market is very different, and the cable industry is facing competition from multiple sources. And, indeed, prior to this proceeding, cable rates had been deregulated in the 48 other states, the only states where rate regulation remained in place were Massachusetts and Hawaii. Counsel, as to Hawaii, is this issue before the Ninth Circuit? No, Your Honor. This is the only challenge. Hawaii, for whatever reason, did not challenge this order. This is the only court that is deciding this issue. Okay. Secondly, I understand partly from the record that AT&T is trying to sell DirecTV now. Is that correct? I don't know, Your Honor. I don't know about that. But if, in fact, if your question is getting to whether the LEC test at some point would no longer be satisfied. Yes, that's what I'm getting at. And what would happen should that there no longer be an affiliate of a LEC which owned DirecTV? If that were to happen, the Massachusetts regulator, the commission could go back to the FCC with a petition for recertification under the FCC's rule 76.910. And it could make a showing that the effective competition that the commission had once found no longer exists in Massachusetts. At that point, rate regulation, again, if the commission approved the certification petition, rate regulation could resume. Okay. Thank you. If there are no further questions, I would just ask that the court affirm the FCC's order. Thank you very much, Your Honors. Thank you. Thank you, counsel. Thank you. Attorney Amundson. Good morning, Your Honor. May it please the court. Jessica Ring Amundson on behalf of Intervenor Charter Communications. We agree with the FCC and with the arguments set forth by Mr. Carr as to the proper interpretation of the LEC test. Under that test, AT&T's affiliate, DirecTV Now, offers video programming services directly to subscribers in charter's franchise areas in Massachusetts and Hawaii. And those services are comparable to the video programming services that charter offers. The FCC's grant of charter's petition is not only correct on the law, but also aligns the regulatory scheme with the realities of today's increasingly competitive marketplace for video programming services. Congress explicitly provided in Section 543 that its preference was for competition and that rate regulation was meant to end once effective competition took root. Charter is subject to effective competition in Massachusetts and Hawaii, and we ask that the FCC's decision be affirmed. I'd like to underscore just three points that we've been discussing this morning. First is as to the meaning of offer, and the phrase offers video programming services directly to subscribers by any means. As Judge Sarris pointed out, that by any means has to be read as a whole in the statute. So the offers video programming services directly to subscribers by any means does not indicate, as MDTC argues, that there is a facilities requirement in that test. Congress knew how to implement a facilities requirement, and it knew how to add into a statute the requirement that the LEC or its affiliate be using its own facilities, and it chose not to do so here. The FCC's decision that offers means a direct relationship between the provider and the subscriber is reasonable and should be accorded deference by the court. Could you address the argument made by your opponent that the FCC has departed from its traditional regulatory definition of offer? Sure, Your Honor. In section or in regulation 76.905, the FCC said that a service should be deemed offered where the provider is physically able to deliver the service to potential subscribers. And I think even Mr. Kravitz and MDTC do not dispute that, in fact, DirecTV now is able to physically deliver the service to subscribers and potential subscribers in the franchise areas. Their contention instead is that it must do so using its own facilities. And so, again, I think we need to look back to the plain terms of the statute, and the plain terms of the statute do not impose any sort of facilities requirement. Pardon me, but I understood his argument to be one that I didn't see in the brief, but he said the FCC has now come up with a billing requirement which was not contained in its prior definition of offer, and it can't do that. That's the argument I thought I just heard. Right, Your Honor. And I don't think the FCC was necessarily – what the FCC was saying is that offers should be given its plain meaning context as in the statute. And all that offers requires is that there be a relationship between the provider and the subscriber. What is the service that you understand you deliver? We, Charter Communications, deliver cable service, but DirecTV now delivers a streaming service over broadband networks that is comparable to and that competes with charter service in the relevant franchise areas. So the service is the delivery of the program over the television. Is it not? You're right that video programming services are delivered to subscribers. That's correct, Your Honor. However, the phrase directly does not mean that it has to be done using the LEC or the LEC affiliate's own facilities. That part of the regulation says physically able to deliver the service. So I want to know what you understand is that they are delivering. So, Your Honor, I think – I don't think, as I said, that even MDTC disputes that DirecTV now is able to physically deliver the service to the subscribers and potentially subscribers in the franchise area. As I understand their argument, I may be mistaken, but as I understand their argument, it is that that delivery is through a third party. That's correct, Your Honor. Their argument – so I don't think they're disputing that the regulation is satisfied here. In fact, DirecTV now is able to physically deliver that. Instead, what they are arguing is that DirecTV now – that to satisfy the LEC test, the LEC or its affiliate must deliver the programming using its own facilities. And that – Congress did not include that as a requirement in the test. Instead, it used very broad, forward-looking language by any means. So Congress was looking toward the future, toward the development of new technologies, and actually rejected proposals that would have imposed particular facilities-based or technology-based requirements. Instead, Congress – rather than kind of a backward-looking test that would have held LECs and their affiliates to the facilities that were available to them at the time, Congress imposed very broad, forward-looking language. And we would ask the court to affirm the FCC's decision. Thank you, counsel. Can I have one question on the – Absolutely. In your brief, it says on page 33, Furthermore, virtually 100% of Charter's cable subscribers in the franchise areas have a broadband connection. So does that mean that no matter how poor they are in that other 20%, they already have the broadband? That's correct, Your Honor. If they're getting your basic services, so they're not having to pay for that extra connection to the broadband? That's correct, Your Honor. As to Charter's existing subscribers, approximately 100% of them already have broadband connections. And so Direct TV Now and Charter are already in competition for those same subscribers, where all that the subscriber would have to do is choose between Charter and Direct TV Now and would not have to purchase any additional broadband subscription. Thank you, counsel. Thank you. There will be a rebuttal from Attorney Kravitz. Yes. Thank you. Yes. Just very quickly, just to pick up on the exchange between Judge Tarroya and my counsel on the other side. That's right. We don't dispute in this proceeding that Direct TV is physically able to deliver service. What we dispute is that they're able to deliver the service directly, directly to subscribers, because that is what the statute demands. The directly requirement is not in the regulation, but it is in the statute, and that is unlike any of the other effective competition tests. It's unique to the LEC test. I also just wanted to take a minute to sort of back out a little bit and explain why it makes sense that Congress would have written this directly to subscribers requirement into the LEC test, whereas it didn't in the other tests for effective competition, and that is because of the unique competitive threat that Congress was responding to when it wrote the LEC test in 1996. What was happening then is that local telephone companies, which by their nature are already hardwired into virtually every household in a community, were beginning to enter the market for video in ways that they had not been able to do before for both technological and legal reasons. Congress made the decision in 1996 that it would invite the telephone companies into this market, but it would also create a special test, a special effective competition test for the telephone companies that applies in the way that we have discussed. It makes sense that they would limit that test to circumstances where the service is delivered directly to the subscribers, because that is what the telephone companies do. They deliver it directly over wires that already exist. Then I finally just wanted to follow briefly on Judge Lynch's question about what would happen if AT&T were to sell off DirecTV, and so that there would no longer be an affiliation with the LEC. I think your question really points out the problem with the interpretation here. Go ahead. You may finish. Thank you. Just to say that the applicability of the LEC test is not supposed to turn on the happenstance of corporate relationships and whether AT&T owns or does not own DirecTV. It is supposed to turn on the competitive threat posed by telephone companies or entities that are like telephone companies that are wired into their customers' homes. Thank you very much. Thank you. Thank you. That concludes argument in this case. Attorney Kravitz, Attorney Carr, and Attorney Evanston, you should disconnect from the hearing at this time.